and counsel may begin whenever they're ready. Good morning, your honors. May it please the court. My name is Karen Milligan Burton. I represent appellant cross appellee Hyundai Motor America. I'm actually here today with Mr Ken Keller, who was lead trial counsel in the district court. I will be arguing Hyundai's appeal from the directed verdict. Um, and Mr Keller will be responding to the Holly's arguments in support of their appeal of the denial of their sanctions motion. Um, we would like to reserve 10 minutes for Mr Keller's response and also for any rebuttal. You'll have to help keep track of that. Thank you very much. Thank you. I will do that. Um, before I begin, your honors, there is a pending motion that's been referred to the merits panel that the Holly's filed to strike most of Hyundai's excerpt of record and major portions of our opening brief. Um, we actually believe the motion is not well taken, but we would prefer to address it up front if the court is inclined to consider it since it does address and bear on the merits of our appeal. I don't have any questions about it. Judge Hall, do you have any questions about it? Oh, I don't. Thank you, your honors. Um, your honors, the respondents in the case, David and Daniel Holly were the officers, shareholders, founders and directors of two corporations that defrauded Hyundai out of more than $1.2 million. Um, it is undisputed that those corporations would never have been formed and would have been unable to operate on a day-to-day basis without the Holly name and the Holly's personal credit. Hyundai has obtained judgments against those two corporations, which are known as ACIDENT and MPDR, for more than $4 million for underlying fraud and RICO violations. Um, unfortunately, those complaints are now defunct and they're bankrupt and Hyundai has been unable to satisfy the judgments. Um, in order to satisfy the judgments and based on the Holly's unique role in these corporations, Hyundai wanted to pierce the corporate veil and hold the Holly's personally responsible for the corporation's conduct. Um, at trial, however, the district court, we believe, misinterpreted the alter ego doctrine. That error of law permeated and prejudiced Hyundai's entire case because it resulted in the exclusion of key evidence of corporate and alter ego liability. We believe that had the district court applied the correct standard of alter ego liability, Hyundai had more than enough evidence to get to the jury. What is your view of the correct standard? Our view of the correct standard is Nevada law. What Nevada looks at is they consider alter ego on a case-by-case basis. It's very fluid. They look at whether there is a unity of interest between the individuals alleged to be the alter egos and the corporation, whether or not those are the same individuals. And then they look at the corporate form and the corporate form is necessary to avoid an injustice and to avoid promoting a fraud. Here we believe all of those factors were met. The Holly's actually provide... Well, the issue for me surrounds whether there was actually sufficient governance and sufficient influence of the affairs of the corporation. And I'd appreciate your addressing your view of the record evidence on that point. Yes, Your Honor. We believe that they controlled and governed the corporation directly and indirectly. We believe directly because they really held the purse strings of this corporation. The corporation performed their painless dent removal services by traveling around to different auctions around the country and working on Hyundai vehicles. The only way that those technicians were able to go to those auctions and work on Hyundai vehicles was because the Holly's personally secured the credit cards that covered all of the travel expenses. The Holly's incorporated... David Holly was the president. The Holly's incorporated Daniel Holly was the secretary and treasurer. Their money and their personal credit got those corporations up and running. Is money the same as governance? I mean, what you're saying could be applied to any investor, anybody who supplies the funds. And is that what's met under Nevada law? Actually, we believe it is. It does fit within Nevada law, because they are influencing the affairs of the corporation merely by providing the financial credibility that allowed the corporation to function. But in addition to their financial credibility, they also contributed to the financial credibility of the corporation. They were controlled indirectly through Dennis Hallam. There was testimony at trial. Can you give us an example of how they controlled the corporation other than the money and using their credit card? In other words, did they participate in the day-to-day activities? Did they get reports? What they were doing or not doing? And could they have questioned anyone? Absolutely, Your Honor. They worked with the corporate accountants on a regular basis. They received financial documents from the corporation about the corporation's operating expenses on a monthly basis. Daniel Holly signed all of the corporation's tax returns. David Holly actually incorporated MPDR and... But how would they have known that they did or didn't do the work they were supposed to do? How would they know that? We believe that they knew that through their relationship with Dennis Hallam, who was their friend, who they turned the entire business over to and basically let him run amok and commit these frauds. Dennis Hallam's testimony, which was unfortunately excluded at trial, and that's another error that we challenge on appeal, he would have testified that the Hollys told him and encouraged him to take care of the Hyundai representative who was taking kickbacks in order to look the other way. But Hallam never discussed the details of that with them, did he? Hallam said that they knew exactly how he was taking care of Robert. And without Hallam's testimony at trial, the Hollys were free to sit on the stand and testify that they knew nothing about this. However, the jury never got to hear from Dennis Hallam, where he said the Hollys knew exactly how we were taking care of Robert Porter. They encouraged me to continue taking care of Robert Porter, and they were very happy at the amount of the money that the corporation was making. And the amount of money that the corporation was making rose dramatically during the time that this fraud against Hyundai was occurring. Well, you know, I'm not sure I read the testimony the same way that you do. Hallam said he knew how he was taking care of Porter, but he also said that he didn't actually discuss in detail how he was doing so. So what is your basis for saying that the Hollys knew? Our basis is there was evidence in the record and evidence that was excluded at trial that the jury could draw an inference that the Hollys knew exactly what was going on. But what specific evidence could they draw that inference from? They could draw the inference from, well, first, obviously, we believe that they did tell Hallam to take care of Porter. There was also evidence in the record that they were... Whatever that means. Well, Hallam said he knew exactly how they were taking care of it. Yes, Hallam knew. Well, do I know about the details of their business life or any fraudulent things they may be doing? Well, it is reasonable to assume that if the Hollys funded a corporation and handed it over to Dennis Hallam to run, that they would have had conversations about how that business was being run. The jury could infer that if they weren't having them at corporate meetings, which they never held, they weren't having them at corporate phone calls, they had no corporate resolutions, that the only time that business could have been discussed was when the men socialized. The jury could definitely infer and actually believe that it was incredible for the Hollys to say they never knew that anything was going on and simply just were happy to sit back and collect their profits, which is exactly what we believe that they did. So you think they would discuss that they were doing fraudulent acts with each other? We don't necessarily... I mean, the evidence in the record doesn't necessarily indicate that the Hollys were out in front of the corporation committing the fraudulent acts, which is what Judge Hunt looked to, but we actually don't believe that Nevada law or law in other jurisdictions required Hunt to prove that. We believe that it was enough to prove that the Hollys knew or should have known that these fraudulent acts were occurring. We believe they should have known because, you know, Daniel Holly was the secretary... But Nevada law does not provide that at this time. I don't see any Nevada case that says that a should-have-known standard is applied to fraudulent acts. I can't specifically say that, but it also does not preclude that. And a couple of the cases that have come recently out of the Nevada Supreme Court, one is Polaris, and that was two individuals who were found to be alter egos of the corporation. There was no indication in that entire opinion that those individuals actually incurred the debt on behalf of the corporation that the plaintiff was trying to satisfy by reaching through the corporation and getting to them. The court was actually troubled by that, but what the court ended up saying was, look, there was enough of a disregard of corporate formalities, we're still going to go ahead and pierce the veil and reach these individuals. I think that was a 1987 case. It's Polaris, and it was cited in our briefs. In addition, there's Lorenz v. Belteo, which is also a Nevada Supreme Court case. I believe it's 1998. And in that case, the corporation was also controlled by a dominating officer and his wife. And the wife was a secretary and a treasurer, and there was no indication that she had actually participated in the wrongful acts. And one of the reasons the court pierced the corporate veil was because she was a secretary and a treasurer, because she never acted as a secretary or treasurer of what the corporation was supposed to. She said she didn't understand the significance of corporate documents that she signed, but what the court said was that even shows that it was even more of a disregard for corporate formalities, because they didn't leave the corporation with a viable secretary or treasurer who was actually operating as such. In addition, one thing about Nevada law is every time the Nevada Supreme Court has considered the alter ego issue, there's always a question of justice. Should the alter ego doctrine or should the veil be pierced in order to promote justice? Again, this court, encouraging the United States, acknowledged that Nevada alter ego law is analyzed on a case-by-case, very flexible basis. Again, we have the proxy and delegation to Hallam. I mean, that's another way that they knew what was going on, or at least they should have known. They gave Hallam their proxy to sign their name to various corporate documents. They didn't give Hallam a formal power of attorney, but nevertheless, they still, Hallam testified by deposition at their trial that they allowed him to sign their names to corporate documents. From that act, the jury can infer that they had given Hallam permission to do any number of things. Unfortunately, Hallam's live testimony was precluded at trial. Your Honors, I do need to say, I apologize, I do need to save some time for Mr. Keller's response, and then I will respond at our conversation at this time. Thank you. Good morning. May I please the court. My name is Jack Merritt, and I represent Daniel and David Holley, and my co-counsel is also my brother, Randy Merritt. And we're very happy to be before the court today to be able to clear up a lot of these differences that appear to be. Would you clear up one difference? Why didn't the Holleys ask some questions? Pardon me, sir? Why didn't the Holleys ask some questions? The Holleys were. They were getting a monthly check, and they saw all this going on. They were 20 percent. They were one-fifth owner of that business. Why didn't they ask some questions of the people who were producing this money? Your Honor. Because they were in the same business. They were also in the automobile business. Actually, very good question, Your Honor. Let me address them separately. Your first question is why didn't they ask some questions. I believe that they did ask questions, as any normal shareholder might, particularly in a small, privately held company. However, this fraud was concealed from the Holleys just as it was if, in fact, there was wrongdoing here from Hyundai. The record clearly shows that Daniel and David Holley did not control the corporation. They were not officers and directors of AAD, ACIDENT. They were officers and directors of MPDR, but contrary to the rush to the discussion of facts that was handled earlier by the counsel for Hyundai, they're two separate corporations. Daniel and David Holley did not become officers and directors of ACIDENT until July 1998, which was after the relationship with Hyundai was terminated. During that period of time, they were simply 10 percent shareholders. There's a fiction here. Ten percent each, right? Ten percent each, yes. Minority shareholders. There's a fiction here that MPDR and AAD are the same companies. They are, in fact, not the same companies. MPDR was originally formed, and it was doing paintless dent removal. However, the record shows that the intent was for MPDR to become another company, take on a different task or function, and it was to become Ace of Paint. That was supposed to take on more detailed auto body repair work than Ace of Paint was. Now then to your next question, Your Honor, with regard to weren't they in the same business? No, they weren't. As a matter of fact, the Holleys operated a very, very small used car dealership in Sarasota, Florida. That's how they got to know about Dennis Hallam. He came by their office one day and offered to do some PDR. They would buy cars from the auction, and that's how they became friends. The Holleys are very nice, good, Midwestern people, and they became friends with him that way. Yes, they did go fishing. Yes, they occasionally did go on vacations. But the Holleys did not know about the fraud. As a matter of fact, it's clear from the record that Ms. Booth's testimony that they were effectively silent partners, had no day-to-day interaction with the operations of the company, and also that they did not know about the secret money that was siphoned off the top of the company, put into those accounts, held secretly from the Holleys by Booth, Hallam, and Bowman. Counsel, let me just follow up a little bit on Judge Wiener's question. Let's assume that the evidence was sufficient to establish that your clients should have known if they'd been paying attention or should have been put on notice to ask more questions. Opposing counsel argues that Nevada law would at least permit liability in that situation, even if there was no actual knowledge. What is your response to that? Is that foreclosed by Nevada law? Is it an open question? It is foreclosed by Nevada law. Let's get a couple of things that maybe I think will help clarify here. As we all know from the first year of law school, alter ego theory was brought up, I believe, if I recall it correctly, from some taxicabs up in New York. Individual taxicabs were set up as separate corporations and they were undercapitalized. And that's how the whole alter ego theory came about. In this particular situation, these were not that type of – this was not that type of situation. Rather, all the Holleys did was make it possible for them to obtain credit cards for them. I mean, Mr. Bowman and Mr. Hallam. That's all they did. I could, with $10 of an – I'm sorry, Your Honor. But if it was more than that, counsel, you'd let them sign his name. Your Honor, that's disputed, actually, by the record. Okay? Again, there is a dispute there. Well, if it's disputed, then why is that a material for a directed verdict? It's disputed by the record, Your Honor, because there are other elements that have to be proven before we get to the alter ego theory. We do know some things about the alter ego theory. We know that alter ego is not a single element doctrine that imposes liability upon a minority shareholder simply because a corporation is unable to pay its obligations. That's one thing we know. If that were the case, then there would be no reason to have corporate laws and every shareholder of WorldCom, Adelphia and Enron would have liability to pay the debts incurred by those corporations. Alter ego is not failing to show corporate formalities. Elect officers, issue stock, et cetera. Alter ego is not being a minority shareholder without the power to force any corporate action. Alter ego is not a minority shareholder failing to file a shareholder's derivative lawsuit to have officers elected, elected corporate meetings held and stock issued. Alter ego is not a minority shareholder who constantly files litigation to get all the financial records to ensure that the bookkeeper and minority shareholders are not setting up secret bank accounts and skinning money off the top to enrich themselves and reduce the income to the minority shareholder. Counsel, could they have continued this business without their money, without the Dawleys? Once the business was off the ground, they certainly could have. In other words, if the Hawleys had withdrawn the money, that would have been the end of their company, wouldn't it? As a matter of fact, Your Honor, Ms. Booth testified at trial that up until the point that Hyundai withdrew the business from the corporation. That's when they learned what was going on. Up until the point that Hyundai withdrew the business from the corporation, the business was self-sufficient. It had money. It was able to pay its own debts. The Hawleys were effectively superfluous at that point in time. They were no longer needed. And, Your Honor, I do want to reserve 10 minutes. I apologize for that. So when we get back to the remainder of this, alter ego is not enforcing the corporate guidelines of a client company. In other words, it is not the requirement of minority shareholders to ensure that Hyundai's own employee is involved in perhaps something that goes against corporate policy and guidelines. Alter ego does not or alter ego does not require that a minority shareholder become an investigator for the company. Alter ego does not require a minority shareholder to balance checkbooks, review financial statements, audit accounts receivable. Anyone who has filed a shareholder's derivative lawsuit, and I've done them on behalf of a minority stockholder in a privately owned company, knows that, at most, you can become thorn in the side of majority shareholders, and that's about it. So we have basically a single element here, and this permeates the opening brief that was filed by Hyundai. An injustice will be served if we cannot get that money back from somewhere. And the only pockets that we know of we can possibly recoup that money from are two people who were taken advantage of just as Hyundai was. If you take a look at the amount of money that was paid to Acent and then the amount that was distributed down to the Holleys, it was substantially less because of the skinning that was done by Hollum and Bowman off the top. Now, it doesn't even require much thought to believe that if the Holleys knew this was going on, they would certainly have ensured that they got that extra money, that they participated in that. They didn't lose any money, did they? No. No, Your Honor, they did not lose any money. I acknowledge that. Did they make any money out of this? I believe that after the deduction of debts, and this is, again, you know, I don't know if this is in the record, but I believe it was about $50,000 apiece. I would like to go back and address another issue with regard to AAD and MPEDR that we just had a brief period of time to touch on. Acedent was a separate corporation. It was effectively doing its own thing without the involvement of Dennis — excuse me, without the involvement of David and Daniel Holley. They were 10 percent shareholders. Once it hit the fan, and by it hit the fan, I mean Hyundai came in and said we're terminating the deal, what happened? Mr. Bowman and Mr. Hallam got together, sent some paperwork down for David and Dan to sign saying you're the President. This was purely a token as far as Dan and Dave were concerned. In reality, it was clearly an option or an attempt to shift the responsibility over to them. So when the judge did correctly rule that there was not enough evidence, he was not going to allow the findings against Hallam and Bowman to be imputed directly to Dan and Dave Holley. What the whole deal was here, Your Honor, was they were trying to pierce the corporate veil. The only way they could get to Dan and Dave was to go through the Hallam and Bowman group, conspiracy, through MPDR, through a sedent, and then to Daniel and David Holley. So this is one of the most concluded piercing the corporate veil matters that's ever been considered, and I'm not aware this being considered by any court. One last point, and I'm not going to be able to reserve the full 10 minutes. In connection with the case of ---- Just excuse me one second. You're chaplain. What are you reserving time for? We are requesting fees. We have a cross-appeal. Okay. Well, you need to argue that or they have nothing to respond to and you have nothing to reply to. Okay. Sorry about that, Your Honor. I apologize. I'll make this brief. In the Carson Meadow case, which is referred to by Counsel for Hyundai, the Supreme Court of Nevada found an individual whose vice president, secretary, and director of a corporation was not the alter ego of a corporation, even though she functioned as an office manager and secretary to the President, received money for the corporation, made deposits for the corporation, and co-signed checks with the President. I want to make that clear. That holding is different than what was represented at the court, assuming that I did understand that she was referring to the Carson Meadows case. Now, in connection with our motion for fees, this was the approach that was taken by counsel, and I do not mean to state that Mr. Keller in any way had an improper demeanor with the court, but rather it was a tactic that was employed by Mr. Keller and Hyundai that merits the award of fees. Your Honor, Hyundai unilaterally pursued the first trial. By the first trial, I'm going to call it the AAD or the Howland trial. They pursued that trial fully knowing that AAD and MPDR were in bankruptcy and stays were entered against them. They also knew that the trial went forward with Daniel and David Hawley also under bankruptcy protection with stays entered against them as well. They proceeded to trial against Bowman, Hollom, and Corder, three people that were unrepresented. There was a statement made, I believe, in the reply brief that they fired their attorneys. From my understanding, and there was no support for that, but from what my understanding is, they ran out of money. Their attorneys effectively ran out of money and then naturally withdrew from the case. So we have a situation where basically there was no attorney to defend them, and not withstanding the fact that they may have made some well-thought-out objections and perhaps, although I don't believe it's in the record, the trial judge did help them on certain occasions. He certainly didn't show them any deference whatsoever when he awarded the damages and troubled them against them. Moreover, by forcing this trial to go forward, by Hyundai Motors forcing the trial to go forward, they made a conscious decision, knowing they were going to be going against three pro per defendants, and it could either be just by a complete fluke or as, when I was in law school, a very well-thought-out problem where, and it truly would be a great law school exam question. If I want to try to get judgments against different parties in a lawsuit where the evidence clearly differs as to the liability and respective knowledge of those parties, does it make the most sense for me to go against the three pro per defendants, the three defendants that I know I've got the most evidence against, get those judgments, then go back to AAD and MPDR, get the bankruptcy stays lifted, have defaults entered against them because they did not have counsel representing them, and then try to take the default judgments against AAD and MPDR and the workings of Hallam, Bowman and Porter, and try to impute that to the only people that have any money in this case? Counsel, what's our standard of review of the district court's decision that you're cross-appealing? It is, it's, it has to be an abuse of discretion, Your Honor. For, yes, it has to be an abuse of discretion. So in this particular situation, we are reviewing it from either this was just, it just was pure happenstance, or we have what's a classical law school exam question. How do I get from A to B to C in the most expedient way possible? How do I then try to take those default judgments and have them awarded or entered against Daniel and David Hawley, the only people that we think have any money here? One last thing, as I would like to reserve five minutes, Your Honor, is that if you take a look at the total amount of evidence that was put forward, there is no proof that Hunch suffered any damages. They couldn't prove it. They still can't prove it. Thank you, Your Honor. Counsel, can I ask you a question? Yes. Yes, Your Honor. Were the Hawleys in privity with the previous defendants in the earlier case? Is there any... I apologize, Your Honor. Is there any issue of preclusion? Oh, the collateral estoppel issue? Collateral estoppel from the prior case. No, Your Honor. As a matter of fact, there's a plethora of case law which I've cited in my brief, and I would like to reserve some time, but no, Your Honor. The AAD and MPDR default judgments, which are the only ones that could be used against the Hawleys, were or are in fact not to have been deemed to be preclusive or to have any dealings with or connection with collateral estoppel because they were not fully litigated. As a matter of fact, despite what is said by Hyundai, this is no – these are no unique default judgments. They didn't have an attorney. They didn't file an answer. They got default judgments. There's nothing unique about that whatsoever. And, Your Honor, since for default judgments, they were not fully litigated, an issue preclusion or collateral estoppel does not apply in this case. All right. Thank you. Thank you, Your Honor. Thank you.  Thank you, Your Honor. Thank you. Point nine. It appears to me that the issue, the only issue that's really being raised at this point in time to justify overturning the district court under the abuse discretion standard is this issue of proceeding in what they have called as a piecemeal fashion. I would note procedurally when the motion for sanctions and attorney's fees was filed in the district court below and was extensively argued, briefed, and through replies, et cetera, that argument was never raised. So I'm not even sure that argument is appropriate at this point in time procedurally. But be that as it may, I would point out to the Court that that argument was extensively briefed with Judge Hunt as we proceeded. It is true that we came up to the first The Hawleys then decided to file bankruptcies, and as we have indicated, we think that was for tactical reasons. But to proceed against the three individuals, we filed an extensive brief with the district court and raised all of these issues with Judge Hunt. It's in the Supplemental Excerpt of Record, tab 3. This was put before the Court as to how we intended to proceed, how the law in the Ninth Circuit authorized this manner of proceeding against the nonbankrupt defendants, being Hallam, Bowman, and Corder. And we also noted to the Court that we then intended to proceed later with respect to the bankrupt defendants, those that were in bankruptcy, those that were also in default, and then to proceed against the Hallams. All of this was put before the Court. The Court agreed with the procedure, had no problems with how we intended to proceed. We did have disagreements, obviously, with Judge Hunt over standards as the case went forward or how the law was to be applied, but he was well aware of this procedure. And I fail to see how this procedure, as it has been characterized, was something that is evidence of bad faith. It simply was the order in which we intended to proceed. It was the – it is true that my clients wanted to get a judgment against these three individuals. My client had been defrauded out of millions of dollars. They had been waiting for their day in court. There had been a number of bankruptcies staying and delaying, and they felt it was important to get these judgments against the first three individuals in an attempt to see if there was any money left. And as we have come to learn, there was no money left at that point in time. So if we are looking at Judge Hunt's denial of their motion for sanctions under an abuse of discretion, I fail to see how this course of proceeding would in any way satisfy the case law that that would be sanctionable conduct. It is not reflective of bad faith. The only other issue that counsel has raised this morning was an issue about no evidence of damages. And I am confused by that, because in the second trial, against the Holleys, over their objection and at an extensive sidebar, our damage expert, Mr. Minicari, who was an in-house accountant at Hyundai, was allowed to testify. And he put forth evidence of $738,000, I think it was $452. Now, I don't understand how they can continue to argue that there was no evidence of damage. They have raised arguments about his methodologies. They made a Daubert motion at trial, all of which was denied by Judge Hunt. So the two issues that they have raised this morning that supposedly would justify overturning the Court, I don't think there's basis for it. If Your Honors have any questions, I'd be more than willing to answer them. Judge Hall, do you have any questions? I think we don't have any further questions for you. Thank you, Your Honor. Your Honors, if I could just respond to a couple points that Counsel for the Holleys made. First, he's arguing that the Holleys were not officers or directors until after the fraud occurred. However, there was testimony at the Holleys' trial from Ruth Booth and from Gary Bowman that ACIDENT and NPDR were one and the same. There was absolutely no difference between the two. The two corporations often paid each other's bills, and the only difference was in name. Second, I would point out that the document actually electing or purportedly electing the Holleys as President, Secretary, and Treasurer of ACIDENT came out in July of 1998. However, no one was elected or appointed before that time. The corporation apparently was just running on the same structure as NPDR. So, and in fact, not naming officers and directors until two years after the corporation was formed is simply another evidence of failure to observe corporate formalities. Counsel also read, I don't know if it was Nevada law on what he believes the alter ego doctrine means, but his focus was on minority shareholders. But the Holleys were not just minority shareholders. David Holley was the President. Daniel Holley was the Secretary and Treasurer. Not only were, again, their names were on, you know, all the corporate documents, but Daniel Holley actually signed all of the corporation's tax returns. And in fact, Daniel Holley signed ACIDENT tax returns from 96 through 98. Nor has Counsel ever in his brief or here today cited a case that shows that the should have known standard is foreclosed by Nevada law. One thing that we argued in our brief was the last time that the Nevada Supreme Court considered the alter ego issue, it expanded it to include reverse piercing to reach the corporation's assets for an individual's debts. But to reach that resort, the court looked to a variety of other jurisdictions, including Wisconsin, New York, Iowa, the Fifth Circuit, the Eighth Circuit. So the court is actually, Nevada Supreme Court is willing to look to other jurisdictions to expand the alter ego doctrine. We cited several cases in our brief. Well, the fact that they've done so in one instance does not suggest necessarily that they would in another. And when our job is to, in diversity action, is to predict what we think the Yes, Your Honor. And as I understand it, they have never gone as far as what you're suggesting. They haven't. Well, they also haven't been presented with facts like these where there was such an egregious fraud and where the two individuals alleged to be alter ego did have a very strong unity of interest with the corporations and the corporations failed to observe corporate formalities. Again, the two cases that we cited. The egregiousness of the fraud, the fraud was not committed by the people that you're trying to hold liable at this point. It was committed by other people. And so I'm not sure how far that gets you in the absence of something that ties these folks specifically to the workings of the company that perpetrated the fraud. Well, one thing, again, is their proxy, which actually, opposing counsel agrees that it is disputed whether or not the Hollies gave Hallam their proxy to sign their name and conduct corporate business in their name. If Hallam had the authority to do that, the Hollies could have given him authority to do anything, including, as we see, they encouraged him to continue taking care of the Hyundai representative. At the very least, that's a question of fact as to whether or not they did know or didn't know what was going on sufficient to go to the jury. I mean, there's nothing defining. I guess I just didn't see anything that suggested that they actually knew what this individual meant. Well, unfortunately, since we were restricted to using Hallam's interview in support of our opposition to exclude his testimony, what had happened was, leading up to the first trial, Hallam had taken the fifth at his deposition. When he revoked the fifth at his trial, he decided that Judge Hunt would not let us question him about the Hollies' role in the corporation, because the Hollies were not on trial there. By the time that he, and while he was on the stand, Hallam fully described the entire scheme. When it was time for the Hollies' trial, the court excluded him from testifying based on his settlement agreement. So, and also, we only had that one interview. There was never an adversary questioning of Hallam. However, we still believe that just by the fact that he did tell them to take care of Robert, and that's actually where the kickback note really strengthens Hallam's testimony. There was a note that the district court excluded that was written by Ruth Booth, the corporation's secretary, that said, $3 to $5 kickback check to David Holley. If the corporation was engaged in practices where it was paying and authorizing kickback checks to David Holley, I mean, it really begs the question of whether the Hollies knew that the corporation was paying kickback checks of $5 to $10 a car to Robert Porter, who was the Hyundai representative. It ties into the entire pattern. Unfortunately, the jury did not get to hear that evidence because the district court excluded it, which is another issue that we challenge on appeal. But as far as the should have known, again, I would just refer to the Lorenz v. Belteo case and also Polaris, which are both Nevada Supreme Court cases. And in, I'm sorry, in Lorenz, that was the case where the court said, even though there was no indication that the corporation's secretary, which was the wife of a major shareholder, that she had actually committed any wrongful acts, the fact that she left the corporation without a functioning secretary or treasurer and never acted as such was sufficient under Nevada law to pierce the corporate veil and reach her actions personally. And the same in Polaris. There was no indication that the court required the plaintiffs to prove that the two individuals had actually incurred the debt on behalf of the corporation that the plaintiff was trying to recover by piercing the corporate veil. So we do not believe that Nevada law precludes the should have known standard. And we do believe Nevada law includes relief if the individuals alleged to be alter egos were passive participants. The cases, actually, that we cited in our brief on the new or should have known standard, particularly Briggs and Fowler, in both of those cases, even though the individuals whose assets were ultimately reached were not actively involved in the wrongs of the corporation, the court still found that justice required piercing the corporate veil and reaching those individuals. I'm sorry, your time has expired. Okay, thank you very much, Your Honor. Thank you. And I believe you have about three minutes remaining on the cross-appeal rebuttal. Thank you, Your Honor. I'll try to keep this briefer than three minutes, if possible. Just a few issues that go directly to the matter of whether fees should have been awarded. One of the things that Mr. Keller represented to the Court was that had there been a Daubert hearing held, and he did, as I believe, state that a Daubert hearing was held on this issue, that the judge, Hunt, let him by him, I mean, Mr. Minicari, testify anyway. If you go back and review the record carefully, that's actually contra. What Judge Hunt said was that he was very uncertain that if he would have held a Daubert hearing, that Mr. Minicari's testimony would have been permitted to come in. Next. Well, did it come in or didn't it? That's a very confusing question. It did come in. Okay. It came in. So if you take a look at all of the issues in the case. So is your argument that it should not have come in? Our argument, just for the purposes of trying to understand the fact that really that there were no damages ever approved, and had it ever been raised. Well, that's a conclusion. I'm trying to understand, did the accountant's testimony come in? Yes, Your Honor. It did, and you did not assign error specifically to the admission of that evidence? No, Your Honor, I did not. Although we did file motions, but we did not do it to exclude. In connection with the lack of evidence against the Holleys, again with regard to fees, we are based with the situation where we have inference upon inference in this case, and nothing more to show that the Holleys had any knowledge or even should have had any knowledge. There comes a point in time when, as an attorney, an officer of the court, you are to make a determination whether your case has merits and to tell your client if it does not. In this particular case, given all the facts that we've seen that have been argued here today before this Court, it is clear there was no case against the Holleys. This litigation was brought with the intent. Counsel, you are supposed to be talking about the cross-appeal, and this is for the sanctions question in your view. This is for the fees, Your Honor, yes. It was brought to coerce money from the Holleys to settle. I was extremely disappointed that in the reply brief to the fees issue that any mention whatsoever of a settlement offer was made in there because I understand those are supposed to be confidential. However, I will assure you that had we had any belief that that would have ended up in an appellate brief, we would have made certain that we had a – something in writing saying it would remain confidential. Going on, there is no evidence that the Holleys knew about it. They didn't posit it. They still haven't posited. Fees are justified in this case. They should be awarded. This case has been going on now, I believe, for four years. We're continuing with this appeal. Last but not least, in terms of the proxy, again, a misrepresentation of the facts here. There is a dispute among the counsel as to whether there was a proxy. There is no dispute in the record, and that goes to fees as well, Your Honor. There's no dispute in the record that there was no proxy issued from Dan and Dave Holley to Mr. Hallam or Mr. Bowman. Thank you, Your Honor. We're taking the position that the High End didn't lose any money? I apologize, Your Honor. Are you still taking the position that High End didn't lose any money out of this? We're taking the position, Your Honor, although it was correctly stated by Judge – and I apologize, Judge Raper? Yes. Okay. That we did not raise that on appeal. Thank you, counsel. The case just argued is submitted, and that completes our calendar for this morning. We'll stand adjourned.
judges: Hall, Graber Weiner